473 So.2d 261 (1985)
DEPARTMENT OF NATURAL RESOURCES, Appellant,
v.
SAILFISH CLUB OF FLORIDA, INC., Appellee.
No. BD-56.
District Court of Appeal of Florida, First District.
July 23, 1985.
Rehearing Denied August 22, 1985.
*262 Bruce Barkett, Asst. Gen. Counsel and Spiro T. Kypreos, Asst. Gen. Counsel, Dept. of Natural Resources, Tallahassee, for appellant.
Thomas M. Beason and Jon Moyle, of Moyle, Flanigan, Katz, FitzGerald & Sheehan, Tallahassee, for appellee.
SHIVERS, Judge.
Appellant Department of Natural Resources (DNR) appeals final order of the Division of Administrative Hearings that Florida Administrative Code (FAC) Rule 16Q-21.05(1)(b)4 and proposed FAC Rule 16Q-21.11 are invalid exercises of delegated legislative authority. We reverse.
At issue are:
(1) Whether the Hearing Officer applied the correct standard of review to the Trustees' authority to manage sovereignty land;
(2) Whether the fee structure for leases in proposed FAC Rule 16Q-21.11 is invalid;
(3) Whether the economic impact statement for the proposed rule is incomplete;
(4) Whether the FAC Rule 16Q-21.05(1)(b)4 constitutes an invalid exercise of delegated legislative authority.
The following material facts are primarily derived from the Final Order.
Appellee Sailfish Club of Florida, Inc. (Sailfish) is a nonprofit Florida corporation which operates a 550-member private club in Palm Beach County. Its facilities include a swimming pool, large dining room, cocktail lounge, private dining rooms, card rooms and a marina with three docks and 62 slips. Sailfish's annual membership dues are $925 per member. The marina docks are constructed over 94,815 square feet of submerged lands owned by the State of Florida Board of Trustees of the Internal Improvement Trust Fund (Trustees). The wet slip space comprises 2,531 linear feet. Marina slips are available to members and are rented at $39.60 per linear foot per year. DNR administers and implements the Trustees' policies.
Prior to March 10, 1970, the Trustees' policy permitted the use of "sovereignty" submerged lands without charging annual fees. At present, all docks, piers and other structures on sovereignty lands which were in existence prior to March 10, 1970, are "grandfathered" and are not subject to the current lease requirements until January 1, 1998.
Beginning March 10, 1970, the Trustees adopted a new policy of licensing sovereignty lands which were used in the operation of marinas, charter boat docks and other commercial mooring facilities. The licensees were required to pay at least 2¢ per square foot annually for those sovereignty lands severed from public use, with the licenses renewable annually upon receipt of the appropriate fee.
On August 25, 1970, the Trustees and Sailfish entered into a license agreement whereby Sailfish agreed to pay the Board 2¢ per square foot for the sovereignty lands occupied. The license states that it shall be renewable annually. Sailfish thereupon expended $205,000 for the construction of docks and other facilities related to the marina function of the club.
Beginning in August 1971 Sailfish began to annually renew its license for one year periods by tendering the license fees of 2¢ *263 per square foot for the 94,815 square feet of submerged lands occupied by the marina. From 1970 until 1980, Sailfish paid the Trustees each year a license fee of $1,896.
In June 1982 DNR informed Sailfish its marina license would increase each year at the rate of 10%. Sailfish declined DNR's suggestion that Sailfish convert its license into a five-year lease. In August 1983 Sailfish paid DNR $2,776.37 for its 1983-84 annual marina license.
On August 1, 1983, DNR adopted amendments to Chapter 16Q-21, FAC, which chapter governs sovereignty submerged lands management. Rule 16Q-21.05(1)(b)4 now requires that existing licenses for use of sovereignty submerged lands be converted into leases upon expiration or renewal date of the license:
(1) All activities on sovereignty lands shall require a lease, easement, consent of use, or other form of approval. The following shall be used to determine the form of approval required:
(b) Lease  is required for:
4. Existing licenses upon the date of expiration or renewal.
The leases would be for terms up to 25 years, renewable at the Trustees' option. Rule 16Q-21.08, FAC (1983 Supp.). As amended in August 1983, the annual lease fee would be computed at a base rate of 6 1/2¢ per square foot, with an additional 20% of the lease fee to be charged for the first annual fee and the per square foot base rate to be revised each year. Marinas open to the public on a first come, first serve basis were allowed a 30% discount per square foot per year. Rule 16Q-21.11(1), FAC (1983 Supp.).
In November 1983 DNR advised Sailfish it would need to obtain a sovereignty submerged land lease to continue to operate, and warned Sailfish if DNR did not receive Sailfish's lease application within 90 days it would assume Sailfish no longer wished to maintain the legal use of its facility and would proceed under the removal structures provisions of Sailfish's license. Sailfish failed to submit a lease application. The annual lease fee would have been $6,162.98 plus 20% surcharge of $1,232.59 for the first year of the lease. A $200 processing fee would also have been required.
In the February 24, 1984 issue of the Florida Administrative Weekly, DNR gave notice of its intent to amend Rule 16Q-21.11 relating to standard annual lease fees. The stated purpose: "to establish a framework for more equitable compensation to [Trustees] ... for exclusionary uses of state-owned submerged lands." The amendment establishes the annual lease fee as the base fee of 6 1/2¢ per square foot or 7% of the total potential annual revenues from the wet slip rental area, whichever is greater, to be calculated:
by multiplying the total number of linear feet for rent in the wet slip rental area times the weighted average monthly per linear foot rental times 12. The weighted average per linear foot rental will be derived from the monthly rates (seasonal rates included). Any ancillary charges, such as membership fees, dues, or miscellaneous fees which are required to rent a wet slip, shall also be proportionately factored into the average monthly rate. Rule 16Q-21.11(1)(a)1.
Thus, the formula prescribed by rule for establishing the rental fee is 7% of the total number of linear feet for rent times the average posted rental rate times 12 (months). The average monthly rental rate is weighted to include a proportionate amount of those fees which the marina owner require the renter to pay in order to rent a space such as membership fees, dues, or other miscellaneous required fees.
The lease fee formula was the result of the work of an interagency task force appointed by the Trustees and comprised of the Executive Directors of DNR, the Department of Revenue and the Governor's Office of Planning and Budgeting, plus staff.
The economic impact statement indicates:
There will be an increase in lease fees for certain existing and new lessees. The amount of increase, if any, will be directly *264 proportional to the lessee's rental rates for wet slips. Generally speaking, the fee increases over the current existing base rate will be higher in the South Florida Coastal areas and lower in the Northwest and Northeast Florida area. Some lessees in certain rural and low rental rate areas will remain at the current base rate and experience no fee increase. There will also be geographical differentials within a particular region which will cause some lessees in highly desirable, high demand boating areas to pay more than those lessees in the less desirable lower demand areas... . [T]he exact individual lease fee increases will vary greatly according to the lessees' rental rates and the fee structure that is currently in their existing lease.... Thus, the economic impact will also vary greatly and cannot be calculated in detail because of the lack of specific rental data from all current lessees. [P. 10]
Sailfish filed a petition for an administrative determination of the validity of DNR Rule 16Q-21.05(1)(b)4, FAC, and proposed DNR Rule 16Q-21.11. After an administrative hearing, the Hearing Officer concluded that Sailfish is substantively affected by the existing rule which requires conversion of a license to a lease upon the expiration or renewal date of the license and by the proposed rule which establishes the fees and payments for such a lease.
The Hearing Officer found that FAC Rule 16Q-21.05(1)(b)4 does not purport to reserve to DNR or the Trustees the discretion to determine if a license must be converted to a lease. She concluded the Rule was inflexible and clear on its face in requiring all licenses to be converted to leases. As to proposed FAC Rule 16Q-21.11, the Hearing Officer concluded that an attempt to base lease fees upon a percentage of total potential revenue constitutes an invalid exercise of delegated authority. She reasoned that a fee not based upon either actual space occupied or actual revenues received or generated does not result in equitable compensation for use of stateowned lands, and is unreasonable, arbitrary, illogical, and irrational. She found that the economic impact statement for proposed Rule 16Q-21.11 is in substantial compliance with section 120.54(2), Florida Statutes, but that it is incomplete insofar as it fails to contain a statement estimating the Rule's effect upon competition in the marina industry. Her order declared that both the said proposed Rule and the said existing Rule constitute invalid exercises of delegated legislative authority.
DNR argues in Point One that the Hearing Officer used an erroneous standard of review when it determined that the rule which requires the conversion of licenses to leases "constitutes an arbitrary and capricious exercise of the board's delegated legislative authority." DNR maintains the Hearing Officer should have used the standard of whether the action or rule constitutes a clear abuse of discretion or a violation of law and cited Hayes v. Bowman, 91 So.2d 795 (Fla. 1957). We find the Hearing Officer used a correct standard of review. Rules promulgated by an agency are subject to Florida Statutes chapter 120, the Administrative Procedure Act, and its judicial interpretation. See Agrico Chemical Co. v. State Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied, 376 So.2d 74 (Fla. 1979), and Grove Isle, Ltd. v. State Department of Environmental Regulation, 454 So.2d 571 (Fla. 1st DCA 1984).
In Point Two, DNR defends the fee structure for leases in proposed Rule 16Q-21.11 and maintains it is not invalid. We agree. Establishing a set rate based upon potential revenues exacts maximum fees for the preemptive use of State lands and is not an arbitrary or capricious exercise of authority. In Agrico, supra, we held:
A capricious action is one which is taken without thought or reason or irrationally. An arbitrary decision is one not supported by facts or logic, or despotic. Administrative discretion must be reasoned and based upon competent substantial evidence. Competent substantial evidence has been described as such evidence *265 as a reasonable person would accept as adequate to support a conclusion.
There is a rational relationship between the amount of available wet slip space and the potential for earnings. There is competent substantial evidence to support the fee structure for the lease and we find it is not arbitrary or capricious.
In Point Three DNR argues that the economic impact statement was sufficient. Although the exact economic impact on each lessee could not be calculated in detail, it is implicit in the statement that there will be some impact upon each lessee. We stated in Brewster Phosphates v. State Department of Environmental Regulation, 444 So.2d 483 (Fla. 1st DCA), pet. rev. denied, 450 So.2d 485 (Fla. 1984), that a department cannot be faulted for failing to make estimates on the basis of unknown variables. We find that the purpose of promoting informal decision-making as to the economic consequences of proposed rules was sufficiently served. See Florida-Texas Freight, Inc. v. Hawkins, 379 So.2d 944 (Fla. 1979).
In DNR's Point Four, DNR asserts that the Hearing Officer erred in determining that FAC Rule 16Q-21.05(1)(b) constitutes an invalid exercise of delegated legislative authority. It contends the Trustees had authority to require Sailfish to convert a license to use sovereignty lands to a lease to use sovereignty lands. We are unable to adopt the position of the Hearing Officer, which would in effect mandate a perpetual renewal in favor of a private entity against the State. Leases in perpetuity are universally disfavored. Sisco v. Rotenberg, 104 So.2d 365 (Fla. 1958); Hutson v. Knabb, 212 So.2d 362 (Fla. 1st DCA 1968); and Sheradsky v. Basadre, 452 So.2d 599 (Fla. 3d DCA 1984), pet. rev. denied, 461 So.2d 113 (Fla. 1985). A provision for automatic renewal does not create a right for more than one renewal. Sheradsky, supra. In the case sub judice DNR does not seek to retake the submerged lands and deny Sailfish the right of use. It seeks to obtain the maximum monetary benefit for private, preemptive use of sovereignty lands. The conversion of the parties' relationship from licensor and licensee to lessor and lessee is not an arbitrary or capricious exercise of delegated legislative authority.
We find and hold that proposed FAC Rule 16Q-21.11 and FAC Rule 16Q-21.05(1)(b)4 are valid exercises of delegated legislative authority.
REVERSED.
ERVIN and JOANOS, JJ., concur.